1  COX, CASTLE & NICHOLSON LLP
   STUART I. BLOCK (STATE BAR NO. 160688)
2  sblock@coxcastle.com
   PETER M. MORRISETTE (STATE BAR NO. 209190)
3  pmorrisette@coxcastle.com
   555 California Street, 10th Floor
4  San Francisco, California 94104
   Telephone:  (415) 392-4200
5  Facsimile:  (415) 392-4250

6  Attorneys for Plaintiff
   PALMTREE ACQUISITION CORPORATION, a Delaware
7  corporation f/k/a Catellus Development Corporation

**ORIGINAL FILED**

E-filing    JUL - 1 2008

RICHARD W. WIEKING
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

8              **UNITED STATES DISTRICT COURT**

9          **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

10                CV 08          3168

11  PALMTREE ACQUISITION CORPORATION, a       CASE NO.
    Delaware corporation,
12
                Plaintiff,                    **COMPLAINT FOR CERCLA COST
13                                            RECOVERY, DAMAGES AND
        vs.                                   DECLARATORY RELIEF**
14
    MICHAEL R. NEELY, an individual; PERRY J.  **DEMAND FOR JURY TRIAL**
15  NEELY, an individual; GARY NEELY, an
    individual; MICHAEL R. NEELY, PERRY J.
16  NEELY and GARY NEELY dba MIKE'S ONE
    HOUR CLEANERS; CHARLES FREDERICK
17  HARTZ dba PAUL'S SPARKLE CLEANERS;
    CHARLES F. HARTZ, an individual;
18  MULTIMATIC CORPORATION, a New Jersey
    corporation; WESTERN STATES DESIGN, a
19  California corporation; MCCORDUCK
    PROPERTIES LIVERMORE, LLC, a Delaware
20  limited liability company individually and as the
    successor to JOHN MCCORDUCK, KATHLEEN
21  MCCORDUCK, PAMELA MCCORDUCK,
    SANDRA MCCORDUCK MARONA, and IMA
22  FINANCIAL CORPORATION, a California
    corporation; STARK INVESTMENT COMPANY,
23  a California general partnership; GRUBB & ELLIS
    REALTY INCOME TRUST, LIQUIDATING
24  TRUST, a California trust; and DOES 1-20,
    inclusive,
25
                Defendants.
26

27

28

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO

57671\122266v5

COMPLAINT FOR CERCLA COST RECOVERY, DAMAGES AND DECLARATORY RELIEF

1    Plaintiff Palmtree Acquisition Corporation ("Plaintiff"), f/k/a Catellus Development

2    Corporation, hereby alleges as follows:

3                              **NATURE OF THE ACTION**

4        1.      This is an action to recover, under the Comprehensive Environmental Response,

5    Compensation, and Liability Act ("CERCLA") and state law, cleanup costs and damages resulting

6    from environmental contamination of real property located in Livermore, California and for

7    declaratory relief in connection with the cleanup.  The contamination resulted from a release of

8    chlorinated solvents, including tetrachloroethylene, also known as perchloroethylene, PERC, or PCE

9    ("PCE"), from Mike's One Hour Cleaners ("Mike's Cleaners") located in the Livermore Arcade

10   Shopping Center at First and P Streets in Livermore, California (the "Shopping Center").  PCE

11   releases have also been documented from Paul's Sparkle Cleaners in the Miller's Outpost Center

12   located adjacent to the Shopping Center.  (For convenience, the Shopping Center and the Miller's

13   Outpost Center may be collectively referred to herein as the "Site.")  The releases of PCE from Mike's

14   Cleaners and Paul's Sparkle Cleaners resulted in the contamination of subsurface soil and

15   groundwater at the Site and in the vicinity of the Site.

16       2.      On February 4, 1993, the then-current owner of the Shopping Center, Defendant Grubb

17   & Ellis Realty Trust, Liquidating Trust, filed a lawsuit in the United States District Court for the

18   Northern District of California (C-93-0383-SBA) seeking recovery of cleanup costs and other

19   damages.  The parties to that lawsuit subsequently entered into a Settlement Agreement and General

20   Release ("Settlement Agreement"), which was entered into and lodged under seal on or about

21   February 11, 1994.  The Settlement Agreement provided for the funding of remediation ongoing at the

22   time of the settlement and for future monitoring of Site conditions.  Paragraph 9 of the Settlement

23   Agreement provided for the reopening of the litigation under certain conditions, including in the event

24   of claims arising from actions brought by third parties and actions by government agencies seeking

25   cleanup of PCE contamination in the deeper groundwater aquifer beneath the Site.

26       3.      On March 17, 2008, the San Francisco Bay Regional Water Quality Control Board

27   ("Water Board") issued a Requirement for Technical Report ("March 17 Letter") requiring the

28   submittal of a work plan and technical report to address the presence of PCE and its breakdown

1    products ("PCE Contamination") in the deep groundwater beneath the Site. The March 17 Letter

2    requires the named parties, including all but one of the Defendants, to submit a work plan and

3    technical report for a groundwater investigation that, among other things, (1) defines the vertical

4    extent of PCE Contamination in the downgradient edge of the plume, (2) defines the hydraulic

5    connectivity between various drinking water wells and the PCE Contamination plume, and (3)

6    assesses the impact of the PCE Contamination plume on drinking water wells and proposes remedial

7    measures as appropriate. A copy of the March 17 Letter is attached as Exhibit 1.

8         4.    Site Cleanup Requirements issued by the Water Board in 1996 attribute PCE

9    contamination in soil and groundwater at the Site to the release and improper disposal of dry cleaning

10   chemicals from Defendants Mike's Cleaners and Paul's Sparkle Cleaners. A copy of Water Board

11   Order No. 96-052, Adoption of Site Cleanup Requirements for the Site ("Water Board Order"), is

12   attached as Exhibit 2.

13        5.    Plaintiff brings this action to recover investigation costs, cleanup costs and other

14   damages, and for declaratory relief, relating to the PCE Contamination at and in the vicinity of the

15   Site, to the extent permitted by the reopener provisions of the Settlement Agreement.

16                              **JURISDICTION AND VENUE**

17        6.    This Court has subject matter jurisdiction over the claims set forth in this complaint, by

18   virtue of Section 113(b) of CERCLA, 42 U.S.C. § 9613(b), and 28 U.S.C. § 1331 (federal question

19   jurisdiction). This Court has supplemental jurisdiction over claims arising under the laws of the State

20   of California pursuant to 28 U.S.C. § 1367.

21        7.    Venue is proper in this district under 42 U.S.C. § 9613(b) and/or 28 U.S.C. 1391(b)

22   because the release occurred in this District and the damages suffered by the Plaintiff occurred in this

23   District.

24                                   **THE PARTIES**

25        8.    Plaintiff Palmtree Acquisition Corporation, f/k/a Catellus Development Corporation, is

26   a Delaware corporation with its principal place of business in Denver, Colorado. Catellus

27   Development Corporation is the successor to Southern Pacific Land Company. Southern Pacific Land

28   Company, and then Catellus, owned the Shopping Center from approximately 1979 through

1    November 26, 1982.

2        9.    Defendants Michael R. Neely, Perry J. Neely, and Gary Neely (individually and

3    collectively referred to as the "Neelys") are individuals who from 1982 until 1987 owned and operated

4    a dry cleaning business under the fictitious business name Mike's Cleaners at 1430 First Street in the

5    Shopping Center.

6        10.    Paul's Sparkle Cleaners, a sole proprietorship owned by Charles F. Hartz and doing

7    business under the fictitious business name of Paul's Sparkle Cleaners ("Paul's Sparkle Cleaners"), is

8    a dry cleaning establishment located in the Miller's Outpost Center adjacent to the Shopping Center.

9    Paul's Sparkle Cleaners has been identified as the source of a second PCE plume which overlaps a

10    portion of the PCE plume emanating from Mike's Cleaners.

11        11.    Multimatic Corporation, a New Jersey corporation ("Multimatic"), and its distributor,

12    Western States Design, a California corporation ("Western") are the companies which manufactured

13    (Multimatic) and supplied (Western) the dry cleaning equipment to the Neelys that was installed and

14    operated at Mike's Cleaners.

15        12.    Defendant Stark Investment Company ("Stark") is a California general partnership.

16    Stark owned and operated the Shopping Center from approximately November 26, 1982 to January 3,

17    1989, including the premises located at 1430 First Street which it leased to the owners or operators of

18    Mike's Cleaners.

19        13.    Defendant Grubb & Ellis Realty Income Trust, Liquidating Trust ( "GERIT") is a

20    California trust with its principal place of business in San Francisco, California.  GERIT owned and

21    operated the Shopping Center from approximately January 3, 1989 through 1996.

22        14.    McCorduck Properties Livermore, LLC, a Delaware limited liability company owned

23    and operated the Miller's Outpost Center located adjacent to the Shopping Center and is a successor to

24    John McCorduck, Kathleen McCorduck, Pamela McCorduck, Sandra McCorduck Marona and IMA

25    Financial Corporation.

26        15.    The true names and/or capacities, whether individual, corporate, associate,

27    governmental, or otherwise, of Defendants Does 1 through 20 are unknown to Plaintiff at this time,

28    who therefore sues said Defendants by such fictitious names.  When the true names and capacities of

1    said Defendants have been ascertained, Plaintiff will amend this complaint accordingly. Plaintiff is

2    informed and believes, and thereon alleges, that each Defendant designated herein as a DOE is

3    responsible, in some actionable manner, for the events and happenings hereinafter referred to, either

4    through said Defendant's own conduct or through the conduct of its agents, servants or employees, or

5    due to the ownership, lease, sale of the instrumentality, or in some other manner, causing the harm

6    alleged by Plaintiff in this complaint.

7                                    **RELEVANT FACTS**

8                        **The Contamination and Remediation**

9         16.    A significant release of PCE occurred at Mike's Cleaners in 1982, when a new dry

10   cleaning machine ("Multimatic Machine") manufactured by Defendant Multimatic was installed by

11   Defendant Western. The PCE storage facilities for that machine spilled and/or leaked PCE to a floor

12   drain. From there the PCE traveled through the sanitary sewer pipe to a disjoint in the pipe where the

13   PCE escaped into the environment.

14        17.    Plaintiff is informed and believes that, beginning in May 1982 and continuing for

15   approximately two weeks, the Multimatic Machine at Mike's Cleaners malfunctioned and spilled

16   and/or leaked substantial amounts of dry cleaning solvent, including PCE. The spill and/or leak was

17   not immediately obvious, and was traced to a three-quarter inch crack on the bottom of the machine.

18   This defective equipment, therefore, resulted in a significant portion of the release through a sudden

19   and accidental occurrence during the course of several weeks of operation in 1982.

20        18.    On or about February 20, 1990, a prospective buyer of the Shopping Center performed

21   groundwater sampling as part of its pre-purchase due diligence efforts. The sampling identified PCE

22   contamination near the premises occupied by Mike's Cleaners. A Remedial Investigation and

23   Feasibility Study for the site cleanup confirmed that the principal source of the PCE plume is a floor

24   drain inside Mike's Cleaners. The results of the investigations also indicated that an additional plume

25   of PCE was emanating from Paul's Sparkle Cleaners located at the adjacent Miller's Outpost Center.

26   This plume overlapped with the primary plume and added further costs to cleanup efforts, particularly

27   by expanding the area requiring remediation.

28        19.    Interim remedial measures were implemented at the Site in June 1992 under the

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP          57671\122266v5                          - 5 -
SAN FRANCISCO
                       COMPLAINT FOR COST RECOVERY, DAMAGES AND DECLARATORY RELIEF.

1    direction of the Water Board, and a full-scale remediation effort was implemented beginning in

2    February-March 1994 based on vapor extraction and air sparging. Groundwater extraction and

3    treatment commenced in the first quarter of 1995 and was completed in February 1996. At that time,

4    it was determined that it was technically infeasible to obtain the prescribed cleanup goal and a non-

5    attainment area was proposed and subsequently adopted by the Water Board. A containment zone risk

6    management plan was implemented to address ongoing issues related to the management of the

7    groundwater within the non-attainment area and at the Site and its vicinity.

8         20.     On March 17, 2008, the Water Board sent the parties subject to the Water Board Order

9    (and who are all also parties to the Settlement Agreement) the March 17 Letter, attached as Exhibit 1,

10   requiring submission of a work plan and technical report to address the recent discovery of PCE

11   Contamination in the deep groundwater at wells outside the non-attainment area. The PCE

12   Contamination in the deep groundwater represents a risk to the environment, the public health and to

13   nearby groundwater supply wells operated by the Alameda Flood Control and Water Conservation

14   District – Zone 7 ("Zone 7 Water Agency"). The Zone 7 Water Agency has also made demands

15   regarding investigation and remediation of the PCE Contamination in the deep groundwater.

16                        **The Settlement Agreement and New Claims**

17        21.     Under Paragraph 9 of the Settlement Agreement, the settling parties released each other

18   from claims relating to the Site that were or could have been raised in the Action with limited

19   exceptions, including claims brought by third parties following the date of the Settlement Agreement

20   relating to PCE contamination at the Site and actions by governmental agencies requiring cleanup of

21   PCE contamination or seeking recovery of governmental response costs for the cleanup of PCE

22   contamination: (a) of the deeper aquifer as defined in paragraph 5 of the Water Board Order or (b) in

23   the form of DNAPLs (the "Reopener").

24        22.     The Parties have now received demands from the Zone 7 Water Agency and an

25   administrative order from the Water Board regarding, among other things, alleged PCE Contamination

26   in the deeper groundwater, as referenced in Paragraph 9 of the Settlement Agreement and triggering

27   the Reopener (collectively, "New Claims"). Pursuant to Section 21 of the Settlement Agreement,

28   written notice of a dispute was provided to all parties and the parties then entered into a period of

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO

57671\122266v5                          - 6 -

COMPLAINT FOR COST RECOVERY, DAMAGES AND DECLARATORY RELIEF.

1  informal negotiation to resolve the dispute. The parties, however, have been unable to resolve the

2  dispute through informal negotiation.

3       23.     Paragraph 22 of the Settlement Agreement provides that under specified circumstances,

4  disputes among the Parties (which includes Plaintiff and all the named Defendants) relating to the

5  Settlement Agreement shall be resolved by binding arbitration administered by Judicial Arbitration

6  and Mediation Services, Inc. (the "Arbitration Provision").

7       24.     The parties to the Settlement Agreement have agreed that resolution of liability issues

8  relating to the New Claims will likely involve litigation in Federal District Court by the parties against

9  (and likely among) third parties who are not parties to the Settlement Agreement and therefore not

10  subject to the Arbitration Provision. To avoid litigation in multiple forums, to permit a timely

11  response to the New Claims and to cost-effectively resolve liability matters relating to the New

12  Claims, the parties to the Settlement Agreement executed an Agreement to Waive Arbitration

13  Provision ("Arbitration Waiver"). A copy of the executed Arbitration Waiver is attached as Exhibit 3.

14  **FIRST CLAIM FOR RELIEF**

15  **(CERCLA – Against All Defendants)**

16       25.     Plaintiff realleges paragraphs 1 through 24 above and incorporates those paragraphs

17  here by reference.

18       26.     The Comprehensive Environmental Response, Compensation, and Liability Act,

19  42 U.S.C. § 9601 *et seq.* ("CERCLA"), was adopted in 1980 in response to the serious problems

20  posed by the improper release and disposal of "hazardous substances." Among other things,

21  CERCLA (1) imposes strict, retroactive, and in certain circumstances joint and several, liability on

22  those responsible for contamination resulting from the release or threatened release of hazardous

23  substances, and (2) provides incentives for private parties such as Plaintiff to supplement

24  governmental enforcement efforts by taking the initiative to clean up sites impacted by the release of

25  hazardous substances.

26       27.     CERCLA Section 107(a), 42 U.S.C. § 9607(a), provides in pertinent part:

27                Notwithstanding any other provision or rule of law, and subject only to

28                the defenses set forth in subsection (b) of this section:

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO

57671\122266v5           -7-

COMPLAINT FOR COST RECOVERY, DAMAGES AND DECLARATORY RELIEF.

* * *

(1)    the owner and operator of a vessel or a facility,

(2)    any person who at the time of disposal of any hazardous

substance owned or operated any facility at which such hazardous

substances were disposed of, [and]

(3)    any person who by contract, agreement, or otherwise arranged

for disposal or treatment . . . of hazardous substances owned or

possessed by such person . . . at any facility . . . owned or operated by

another party or entity and containing such hazardous substances,

* * *

shall be liable for--

(A)    all costs of removal or remedial action incurred

by the United States Government or a State or an Indian

Tribe not inconsistent with the national contingency plan;

[and]

(B)    any other necessary costs of response incurred by

any other person consistent with the national contingency

plan . . . .

28.    The PCE Contamination discharged, deposited, disposed, spilled, or emitted into the soil and groundwater at the Site and in the vicinity of the Site constitute "hazardous substances" as that term is defined in CERCLA Section 101(14), 42 U.S.C. § 9601, and in the regulations promulgated pursuant to CERCLA Section 102, 42 U.S.C. § 9602.

29.    The discharge, deposit, disposal, escaping, leaching, spilling, or emission of the PCE Contamination at the Site and in the vicinity of the Site constitute a "release" or "releases" of hazardous substances within the meaning of CERCLA Section 101(22), 42 U.S.C. § 9601(22).

30.    The Site and the vicinity of the Site area are areas where hazardous substances have been deposited, disposed of or otherwise come to be located and therefore each constitutes a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO

57671\122266v5                    - 8 -

COMPLAINT FOR COST RECOVERY, DAMAGES AND DECLARATORY RELIEF.

1    31.    The dry cleaning equipment at Mike's Cleaners constitutes a "facility" within the

2    meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

3    32.    Plaintiff and all the Defendants are "person[s]" within the meaning of Section 101(21)

4    of CERCLA, 42 U.S.C. § 9601(21).

5    33.    As owners and/or operators of the Shopping Center, Defendants GERIT and Stark were

6    each an "owner" and "operator" of a "facility" at the time hazardous substances were released,

7    disposed of, spilled, discharged, leaked, escaped or where otherwise emitted at the Site and in the

8    vicinity of the Site.

9    34.    The Neelys, as lessees of the premises occupied by Mike's Cleaners and as the

10    operators and owners of Mike's Cleaners, are each individually and together an "owner" and

11    "operator" of a "facility" at the time hazardous substances were released, disposed of, spilled,

12    discharged, leaked, escaped or where otherwise emitted at the Site and in the vicinity of the Site.

13    35.    The McCorducks, as owners of the Miller's Outpost Center, are each individually and

14    together an "owner" and "operator" of a "facility" at the time hazardous substances were released,

15    disposed of, spilled, discharged, leaked, escaped or where otherwise emitted at the Site and in the

16    vicinity of the Site.

17    36.    Paul's Sparkle Cleaners, as the owner and operator of the cleaners at the Miller's

18    Outpost Center, is an "owner" and "operator" of a "facility" at the time hazardous substances were

19    released, disposed of, spilled, discharged, leaked, escaped or where otherwise emitted at the Site and

20    in the vicinity of the Site.

21    37.    As manufacturer and distributor, respectively of the equipment in use at Mike's

22    Cleaners, Multimatic and Western are each an "owner" and "operator" of a "facility" at the time

23    hazardous substances were released, disposed of, spilled, discharged, leaked, escaped or where

24    otherwise emitted at the Site and in the vicinity of the Site.

25    38.    The costs Plaintiff has incurred and will continue to incur in responding to the releases

26    or threatened releases of hazardous substances at in the vicinity of the Site, including those required

27    by the March 17 Letter, are necessary costs of response that are consistent with the National Oil and

28    Hazardous Substance Pollution Contingency Plan ("NCP"), 40 C.F.R. Part 300, within the meaning of

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO

57671\122266v5                                                    - 9 -

COMPLAINT FOR COST RECOVERY, DAMAGES AND DECLARATORY RELIEF.

1    Section 107(a)(4)(B) of CERCLA, 42 U.S.C. § 9607(a)(4)(B).

2         39.    Pursuant to CERCLA Sections 107(a) and (e)(2), 42 U.S.C. §§ 9607(a) and (e)(2),

3    Defendants are liable to Plaintiff for all response costs Plaintiff has incurred to date and will incur in

4    the future, including interest at the rate prescribed in CERCLA.

5                              **SECOND CLAIM FOR RELIEF**

6              **(Declaratory Relief Under CERCLA – Against All Defendants)**

7         40.    Plaintiff realleges paragraphs 1 through 39 above and incorporate those paragraphs

8    here by reference.

9         41.    An actual controversy has arisen and now exists between the Plaintiff on the one hand

10   and the Defendants on the other hand with respect to their respective rights and obligations under

11   CERCLA.

12        42.    Issuances of a declaratory decree pursuant to 28 U.S.C. § 2201 and 42 U.S.C. §

13   9613(g)(2) therefore is necessary and appropriate.

14                              **THIRD CLAIM FOR RELIEF**

15              **(Continuing Public Nuisance – Against All Defendants)**

16        43.    Plaintiff realleges paragraphs 1 through 42 above and incorporate those paragraphs

17   here by reference.

18        44.    The PCE Contamination released, disposed of, spilled, discharged, leaked, escaped or

19   where otherwise emitted into the soil and groundwater at and in the vicinity of the Site constitutes a

20   nuisance within the meaning of Section 3479 of the California Civil Code.

21        45.    The releasing, disposing of, spilling, or discharging of the PCE Contamination, which

22   is a hazardous substance, violates, among other things, California Fish and Game Code Section

23   5650(a) and California Health & Safety Code Section 5411.  The conditions thus constitute a nuisance

24   per se.

25        46.    The PCE Contamination released, disposed of, spilled, discharged, leaked, escaped or

26   otherwise emitted at and in the vicinity of the Site constitutes a public nuisance within the meaning of

27   Section 3480 of the California Civil Code because it affects and is injurious to, among other things,

28   the groundwater of the State of California, the community of Livermore and the wells operated by the

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO

57671\122266v5                          - 10 -

COMPLAINT FOR COST RECOVERY, DAMAGES AND DECLARATORY RELIEF.

1    Zone 7 Water Agency, which provide drinking water to the public.

2        47.    The PCE Contamination, which constitutes a nuisance, is specially injurious to Plaintiff

3    within the meaning of the Section 3493 of the California Civil Code because Plaintiff has incurred and

4    will continue to incur costs to remediate the PCE Contamination.

5        48.    The nuisance is "continuing" in that it is capable of abatement at reasonable cost and

6    by reasonable means and in that its impacts vary over time.

7    **FOURTH CLAIM FOR RELIEF**

8    **(Negligence – Against Defendants Neelys, Multimatic and Western)**

9        49.    Plaintiff realleges the allegations in paragraphs 1 through 48 and incorporates them by

10    reference herein.

11        50.    Defendant Multimatic is now, and at all times mentioned in this complaint was, in the

12    business of designing, manufacturing, constructing, assembling, inspecting and selling dry cleaning

13    equipment for commercial use.

14        51.    Defendant Western is now, and at all times mentioned in this complaint was, in the

15    business of marketing and distributing dry cleaning equipment for commercial use on behalf of

16    Multimatic.

17        52.    During the construction, marketing and distribution of dry cleaning equipment,

18    Multimatic and Western had a duty to use reasonable care so that their product could be used without

19    inflicting harm or damage on the public or the environment.

20        53.    Defendants Multimatic and Western sold the Neelys the dry cleaning machine used in

21    Mike's Cleaners at all times during the period of the PCE releases.

22        54.    Defendants Multimatic and Western so negligently and carelessly designed,

23    manufactured, constructed, assembled, inspected, and sold the machine described above that it was

24    dangerous and unsafe for its intended uses.  Specifically, that dry cleaning equipment was installed

25    with, and/or developed a crack which improperly spilled and/or leaked PCE onto the floor of Mike's

26    Cleaners, from which it was transmitted to the environment, including nearby soils and groundwater.

27        55.    Defendants Multimatic and Western knew or reasonably should have known that the

28    failure of the dry cleaning machine to contain PCE could result in the release of the hazardous

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO
57671\122266v5    - 11 -
COMPLAINT FOR COST RECOVERY, DAMAGES AND DECLARATORY RELIEF.

1    substances into the environment from the premises.

2        56.    During their operation of Mike's Cleaners, the Neelys had a duty to exercise ordinary

3    care in the conduct of their business.

4        57.    By discarding and disposing of PCE into the floor drain rather than via a licensed

5    hazardous waste hauler, the Neelys failed to conform to this standard of care.

6        58.    By discarding and disposing of PCE into the floor drain, the Neelys caused the

7    contamination of the soils and groundwater beneath the Shopping Center and offsite of the Shopping

8    Center due to the migration of the contamination.

9        59.    The Neelys knew or reasonably should have known that their failure to exercise

10    ordinary care in managing and maintaining the property and in complying with all laws and

11    regulations applicable to the use of the property would result in the release of the hazardous

12    substances onto the property and into the environment.

13        60.    Plaintiff was not aware of its injury as a result of the PCE Contamination until it

14    received the March 17th Letter and, in fact, Plaintiff was not injured until it incurred costs responding

15    to the March 17th Letter.

16        61.    As a direct and proximate result of the negligence herein alleged, Plaintiff has suffered

17    and will continue to suffer damages in an amount according to proof.

18                            **FIFTH CLAIM FOR RELIEF**

19                    **(Equitably Indemnity – Against All Defendants)**

20        62.    Plaintiff realleges paragraphs 1 through 61 above and incorporate those paragraphs

21    here by reference.

22        63.    The PCE Contamination of the Site and the offsite migration of the PCE Contamination

23    was caused by the wrongful acts and omissions of the Defendants, and each of them, as alleged herein.

24        64.    As a direct and proximate result of such acts and omissions of the Defendants, and each

25    of them, Plaintiff has incurred and will continue to incur costs, expenses, and damages.

26        65.    Plaintiff is entitled to full equitable indemnity for such costs, damages, and expenses

27    from the Defendants, and each of them.

28

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP    57671\122266v5                        - 12 -
SAN FRANCISCO
                    COMPLAINT FOR COST RECOVERY, DAMAGES AND DECLARATORY RELIEF.

## SIXTH CLAIM FOR RELIEF

### (Declaratory Relief Under State Law – Against All Defendants)

66.    Plaintiff realleges paragraphs 1 through 65 above and incorporate those paragraphs here by reference.

67.    An actual controversy exists between Plaintiff and each of the Defendants with respect to their rights and obligations under State laws.

68.    Plaintiff accordingly seeks a judicial determination and declaration of its rights with respect to the claims and damages alleged in this action, including but not limited to a declaration of the Defendants' responsibilities to indemnify Plaintiff for the cleanup costs and related damages suffered by Plaintiff.

### PRAYER FOR RELIEF

Wherefore, Plaintiff prays for relief as follows:

1.    For entry of a judgment against all Defendants for the costs incurred by Plaintiff in connection with conducting response actions at the Site and in the vicinity of the Site;

2.    For entry of a judgment against all Defendants on Plaintiff's state law causes of action for all damages incurred by Plaintiff (including but not limited to cleanup costs);

3.    For entry of a declaratory judgment under CERCLA against all Defendants for the costs yet to be incurred by Plaintiff in connection with conducting response actions;

4.    For entry of a declaratory judgment against all Defendants on Plaintiff's state law causes of action;

///

///

///

///

///

///

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO

57671\122266v5

- 13 -

COMPLAINT FOR COST RECOVERY, DAMAGES AND DECLARATORY RELIEF.

5.     For award of costs and prejudgment interest as permitted by law; and

6.     For such other relief as the Court deems appropriate.

DATED:  June 30, 2008                    COX, CASTLE & NICHOLSON LLP


By: _____
       Stuart I. Block
       Peter M. Morrisette
       Attorneys for Defendant
       PALMTREE ACQUISITION CORPORATION


### DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure and Local Rule 3-6(a) of the U.S. District Court for the Northern District of California, Plaintiff demands a trial by jury for all issues so triable.


DATED:  June 30, 2008                    COX, CASTLE & NICHOLSON LLP


By: _____
       Stuart I. Block
       Peter M. Morrisette
       Attorneys for Defendant
       PALMTREE ACQUISITION CORPORATION


LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO

57671\122266v5                    - 14 -

COMPLAINT FOR COST RECOVERY, DAMAGES AND DECLARATORY RELIEF.

EXHIBIT 1



# California Regional Water Quality Control Board
## San Francisco Bay Region



Linda S. Adams
*Secretary for
Environmental Protection*

1515 Clay Street, Suite 1400, Oakland, California 94612
(510) 622-2300 • Fax (510) 622-2460
http://www. waterboards.ca.gov/sanfranciscobay

Arnold Schwarzenegger
*Governor*

Date: March 17, 2008
File No: 01S0216 (CFC)

Ms. Anni Chapman
Catellus Development Group
66 Franklin Street, Suite 200
Oakland, CA 94607
achapman@catellus.com

Mr. Ronald Velli
Multimatic
162 Veterans Drive
North Vale, NJ 07847
multdc@aol.com

Mr. Steven Song
Mike's One Hour Cleaners
1516 First Street
Livermore, CA 94550
steveyolsong@yahoo.com

Mr. Jeffrey P. Stark
Deputy District Attorney
Rene C. Davidson Courthouse
1225 Fallon Street, Room 900
Oakland, CA 94612

Mr. Dennis W. Mack
Western State Design
25616 Nickel Place
Hayward, CA 94545
dmack@westernstatedesign.com

Mr. John McCorduck
McCorduck Properties
Livermore, LLC
1615 Bonanza Street, Suite 401
Walnut Creek, CA 94596
jmccord@pacbell.net

Hon. Fortney H. Stark, Jr.
House of Representatives
39300 Civic Center Dr., Ste. 220
Fremont, CA 94538

Mr. Charles F. Hartz
1332 Railroad Avenue
Livermore, CA 94550
cputts@aol.com

Ms. Kimberly Krugman
Vice President, Senior Counsel
Grubb & Ellis Company
500 West Monroe Street, Ste 2800
Chicago, IL 60661
kim.krugman@grubb-ellis.com

Perry J. and Michael R. Neely
DBA: Mike's One Hour Cleaner
% Ms. Christine K. Noma
Wendel, Rosen, Black & Dean LLP
1111 Broadway, Suite 2400
Oakland, CA 94607-4036
cnoma@wendel.com

Mr. Lawrence Holthaus
IMA Financial Corporation
1777 Borel Place, Suite 305
San Mateo, CA 94402
imafin@aol.com

Mr. Bill Olinger
Hoyt Corporation
251 Forge Road
Westport, MA 02790-1141
bolinger@hoytcorp.com

Subject:   Requirement for Technical Report Pursuant to Task D.6 of Board Order 96-052 –
Livermore Arcade Shopping Center/Miller's Outpost Shopping Center, 1410/1554
First St., Livermore, Alameda County

Dear Sirs and Madams:

This letter responds to recent groundwater data from monitoring and water supply wells. As
explained below, I require a Technical Report to address the recent exceedence of groundwater
cleanup standards and rising/erratic trends in wells outside of the non-attainment area as defined
in Board Order 96-052 (Order), for the Livermore Arcade Shopping Center/Miller's Outpost
Shopping Center (LASC/MOSC) site.

### Regulatory Background

The Order, adopted on April 17, 1996, established site cleanup requirements for the LASC/MOSC site. Cleanup Plan and Cleanup Standards (B.2) of the Order established groundwater cleanup standards for tetrachloroethene (PCE) and its breakdown products in monitoring wells installed outside the non-attainment area (MW-33 and DMW-03), monitoring well MW-14, deep monitoring wells DMW-01, and DMW-02, and water supply wells CWS-03 and CWS-08. The cleanup standards for these wells were based on maximum contaminant levels (MCLs). Groundwater cleanup standards were not established in the Order for water supply wells further to the west (CWS-14 and CWS-31). At the time of the adoption of the Order, water supply well CWS-14 was operating, but did not have an historic detection of PCE. Water supply well CWS-31 did not begin operation until 2002.

Task D.6 of the Order, *Evaluation of New Technical Information*, requires that a technical report acceptable to the Executive Officer evaluating new technical information which bears on the approved containment/cleanup plan and cleanup standards for this site be submitted no later than 90 days after requested by the Executive Officer.

### Recent Sampling Results

In September 2007, Orion performed a semi-annual groundwater monitoring event at the LASC/MOSC site. Pertinent monitoring well data include the following (see Attachment A for well locations):

- **MW-33** (downgradient edge of plume, *outside of non-attainment area*, shallow groundwater zone): **PCE = 12 µg/L.** A confirmation sample was obtained on September 27, 2007 (PCE = 12 µg/L), and a fourth quarter sample was obtained on December 11, 2007 (PCE = 17 µg/L).

- **DMW-03** (downgradient edge of plume, *outside of non-attainment area*, deep groundwater zone): **PCE = 3.7 µg/L.**

Pursuant to the Order, the cleanup standard for PCE in monitoring wells *outside of the non-attainment area* is the MCL of 5.0 µg/L. The September and December, 2007, PCE concentrations at well MW-33 were the first exceedences of the MCL since 2001. The September 2007 PCE concentration at well DWM-03 was the historic high concentration for the well (see Attachment B).

Sampling results from water supply wells CWS-08, -14, and -31 late 2007 and early 2008 were as follows:

- **CWS-08: PCE = 1.0 µg/L** on October 17, 2007.

- **CWS-14: PCE = 8.1 µg/L** on October 17, 2007, **1.2 µg/L** on November 6, 2007, **1.25 µg/L** on December 4, 2007, and **2.97 µg/L** on January 9, 2008.

- **CWS-31: PCE = 0.61 µg/L** on November 6, 2007.

The October 2007 PCE concentration at water supply well CWS-08 was the highest since February 2005, and near the historic high concentration for that well of 1.4 µg/L (March 2000).

Livermore Arcade Shopping Center/Miller's Outpost Shopping Center                                    3

The October 2007 PCE concentration at water supply well CWS-14 exceeded the MCL, and was the historic high concentration for that well. The November 2007 PCE concentration at water supply well CWS-31 was the historic high concentration for that well, and the fifth consecutive PCE detection following only one detection in the first 2.5 years of sampling (see Attachment B).

In a letter to the Water Board dated January 14, 2008, Zone 7 outlined their concerns regarding the PCE release at LASC/MOSC. They urged the Water Board to rescind the existing Order and adopt a new Cleanup and Abatement Order to require more aggressive characterization and remediation, and to require the responsible party to pay the public water supplier for costs of mitigation and preventative treatment. Orion, on the behalf of the LASC/MOSC Clean Up Fund, responded in a letter to the Water Board dated January 28, 2008. The LASC/MOSC Clean Up Fund expressed the opinion that the request to rescind the Order is unwarranted.

## Evaluation of Subsequent Sampling Results

The recent sampling results at monitoring well pair MW-33 and DMW-03 indicate that there is no stability in the critical leading edge of the LASC/MOSC plume. There have been three consecutive cleanup standard exceedences in two consecutive quarters at well MW-33. Furthermore, PCE detections in the deeper groundwater zone at well DMW-03 imply that the LASC/MOSC plume may be reaching deeper aquifers downgradient of the source, and that the vertical extent of contamination at the downgradient edge of the plume is not defined. The lack of downgradient plume definition and the potential of the LASC/MOSC plume resulting in PCE contamination at one or more water supply wells jeopardizes the principal factor for a the Containment/Cleanup Plan that the PCE plume is stable and limited to a shallow aquifer that is not used for drinking water purposes.

The erratic, yet increasing PCE concentrations observed in water supply wells CWS-08, -14, and -31, suggest hydraulic connectivity with the plume. There is no implication at this time that all the PCE in water supply wells CWS-08, -14, and -31 originated from the LASC/MOSC plume. However, based on proximity and flow direction, we conclude that the LASC/MOSC plume is a significant source of contamination at one or more of these wells. The suggestion that PCE contamination in these water supply wells derives from sources other than the LASC/MOSC plume is at this time purely speculative. Other dry cleaners, based on the mapping by Zone 7 Water Agency, are either further upgradient, or more cross-gradient (south) of the three CWS wells. A Phase II investigation in 2001 at the next closest dry cleaner site (former Clean 'n' Press at 1108 East Stanley Boulevard), approximately 1,000 feet west-southwest of the LASC/MOSC plume, reported no groundwater impacts under the site. PCE contamination detected at CWS wells to the north (CWS-10 and CWS-19) is not considered to be attributed to the LASC/MOSC plume due to their distance and relative position (3,000 to 4,000 feet cross-gradient), and their implication in the Orion January 28, 2008 letter is not pertinent to this case.

Livermore Arcade Shopping Center/Miller's Outpost Shopping Center                    4

## Requirement for Technical Report

Pursuant to Task D.6 of the Order, I require you to submit a technical report acceptable to the Executive Officer, no later than June 13, 2008, for a groundwater investigation that accomplishes the following:

- Defines the vertical extent of PCE contamination in the downgradient (leading) edge of the LASC/MOSC plume and/or in the immediate vicinity of CWS-14
- Defines the hydraulic connectivity between wells CWS-08, -14 and -31, and the LASC/MOSC plume
- Assesses the contribution of PCE from the LASC/MOSC plume to the CWS wells and propose remedial alternatives, as appropriate

It is our understanding that CWS will agree to coordinate with Ellis Partners, Inc. with hydraulic connectivity and discrete depth groundwater sampling activities at CWS wells, provided that these activities are performed before the end of May 2008. I strongly encourage the submittal of a Work Plan prior to initiating field activities. Failure to submit an acceptable report will result in consideration by the Water Board to rescind the existing Order and adopt a new Order to address this issue.

## Other

Staff is in the process of reviewing the technical report, *Contingency Plan for Livermore Arcade Shopping Center/Miller's Outpost Shopping Center* (August 1, 2007), submitted on behalf of Ellis Partners, Inc., as the Project Manager[1], by Orion Environmental, Inc. However, the urgency of the plume stability issue compels us to focus first on this issue. Our response to the Contingency Plan will follow shortly.

If you have any questions, please contact Cleet Carlton of my staff at (510) 622-2374 [e-mail ccarlton@waterboards.ca.gov].

Sincerely,

Digitally signed by Stephen Hill
Date: 2008.03.17 10:31:04 -07'00'

Bruce H. Wolfe
Executive Officer

Attachments:
    A - Site Map Showing Wells with Referenced Sampling Results
    B - PCE Trend Graphs of Selected Wells

---

[1] Ellis Partners LLC is the Project Manager under the Project Manager Agreement, dated December 16, 1993, and entered into by and between certain potentially responsible parties in settlement of their CERCLA litigation over contamination at the LASC/MOSC Site.

Livermore Arcade Shopping Center/Miller's Outpost Shopping Center

cc (w/ attachments):

LASC/MOSC Clean Up Fund
c/o Ellis Partners, Inc.
Attn: James F. Ellis, Project Manager
111 Sutter Street, Suite 800
San Francisco, CA 94104
jim@EllisPartners.com

Mr. Stuart Block
Cox, Castle & Nicholson LLP
555 California Street, 10th Floor
San Francisco, CA 94104
email: sblock@coxcastle.com

Ms. Krista A. Landerholm
ProLogis
4545 Airport Way
Denver, CO 80239
klanderholm@prologis.com

Mr. Charles Kline
Charles Kline Management
151 Callan Avenue, Suite 213
San Leandro, CA 94577
polvorosa8@aol.com

Hon. Fortney H. Stark, Jr.
House of Representatives
239 Cannon House Office Building
Washington, DC 20515-0513

Kenneth W. Pritikin
Foley McIntosh Frey & Claytor
3675 Mt. Diablo Blvd, Suite 250
Lafayette, CA 94549
kwp@foleymcintosh.com

Mike Purchase
Orion Environmental, Inc.
3450 E. Spring Street, Suite 212
Long Beach, CA 90806
mpurchase@orionenv.com

Patrick Hubbard
Treadwell & Rollo, Inc.
555 Montgomery Street, Suite 1300
San Francisco, CA 94111
pbhubbard@treadwellrollo.com

Sandi Nichols
Allen Matkins Leck Gamble Mallory &
Natsis
Three Embarcadero Center, 12th Floor
San Francisco, CA 94111
snichols@allenmatkins.com

Linda Niemeyer
Watermark/Northrop Grumman
3343 Fosca Street
Carlsbad, CA 92009
laniemeyer@roadrunner.com

Cheryl Dizon
Zone 7 Water Agency
100 North Canyons Parkway
Livermore, CA 94551
cdizon@zone7water.com

Danielle Stefani
Hazardous Materials Program
Livermore-Pleasanton City Fire Department
3560 Nevada Street
Pleasanton, CA 94566
dstefani@lpfire.org

Tarrah Henrie
California Water Service Company
1720 North First Street
San Jose, CA 95112
thenrie@calwater.com

Livermore Arcade Shopping Center/Miller's Outpost Shopping Center

## ATTACHMENT B (Continued)
### PCE Trend Graphs of Selected Wells





EXHIBIT 2

CALIFORNIA REGIONAL WATER QUALITY CONTROL BOARD
SAN FRANCISCO BAY REGION

ORDER NO. 96-052

ADOPTION OF SITE CLEANUP REQUIREMENTS AND RESCISSION OF ORDER NO. 93-139 FOR:

GRUBB AND ELLIS REALTY INCOME TRUST, LIQUIDATING TRUST; STARK INVESTMENT COMPANY; CATELLUS DEVELOPMENT CORPORATION; STEVEN SONG, MICHAEL NEELY AND PERRY NEELY dba MIKE' S ONE HOUR CLEANERS; MILLERS OUTPOST SHOPPING CENTER ASSOCIATES, IMA FINANCIAL CORPORATION; KATHLEEN McCORDUCK, JOHN McCORDUCK, PAMELA McCORDUCK AND SANDRA McCORDUCK MARONA; FORTNEY H. STARK, JR.; CHARLES HARTZ dba PAUL' S SPARKLE CLEANERS

for the properties

LIVERMORE ARCADE SHOPPING CENTER
located at  FIRST AVENUE AND "P" STREET, AND
MILLERS OUTPOST SHOPPING CENTER
located at RAILROAD AVENUE AND "P" STREET
LIVERMORE, ALAMEDA COUNTY

The California Regional Water Quality Control Board, San Francisco Bay Region (hereinafter Board), finds that:

1.    **Site Location:**  The Livermore Arcade Shopping Center (LASC), also known as Vintners Square Shopping Center, is located at the northwest corner of  First Avenue and P street, Livermore, Alameda County, California. The Millers Outpost Shopping Center (MOSC) is located, adjacent to LASC, at the northwest corner of Railroad Avenue and P street, Livermore, Alameda County. The LASC and MOSC properties cover an approximate area of 17 acres. For the purposes of this Order, both the LASC and MOSC properties shall be hereinafter collectively referred to as the "site". The site is within the downtown Livermore area and is currently used for commercial purposes. The current land use north-northwest of the site is residential. The site location is shown in Figure 1.

2.    **Site History:**  The LASC is currently owned by Grubb and Ellis Realty Income Trust, Liquidating Trust (GERIT). Mike's One Hour Cleaners (Mike's Cleaners) is a dry cleaning facility at the LASC. Paul's Sparkle Cleaners (Paul's Cleaners), located approximately 450 feet northwest of and downgradient to Mike's Cleaners, is a dry

cleaning facility at MOSC. Tetrachloroethylene (PCE) was routinely used in the dry cleaning operations at both Mike's Cleaners and Paul's Cleaners. During the operations, there were instances of PCE spills and disposal of PCE wastes to the sanitary sewer drains that lead to soil and groundwater pollution at the site.

3.   **Named Dischargers**: GERIT is a secondary discharger because it currently owns LASC. Stark Investment Company and Catellus Development Corporation are secondary dischargers because they are past owners of LASC. Steven Song, Michael Neely and Perry Neely are primary dischargers because they operated at Mike's Cleaners. MOSC associates is a limited partnership of which IMA Financial Corporation is the managing general partner. MOSC Associates is a secondary discharger because it currently owns MOSC. Kathleen McCorduck, John McCorduck, Pamela McCorduck, Sandra McCorduck Marona, Stark Investment Company, and Fortney H. Stark are secondary dischargers because they are past owners of the MOSC. Charles Hartz operated at Paul's Cleaners and is a primary discharger.

The secondary dischargers will be responsible for compliance if the Board or Executive Officer finds the primary dischargers have failed to comply with the requirements of this Order. If additional information is submitted indicating that other parties caused or permitted any waste to be discharged on the site where it entered or could have entered waters of the State, the Board will consider adding that party's name to this Order.

4.   **Regulatory Status**: This site is subject to the following Board order:

Site Cleanup Requirements, Order No. 93-139, adopted October 20, 1993.

5.   **Site Hydrogeology**: The site consists of several buildings that occupy the majority of the total surface area . The remaining area is currently covered by asphalt and/or concrete. The sediments encountered during drilling are the upper part of the Pleistocene Livermore Formation that consists of yellowish-brown clay, silt, sand, and gravel deposited in alluvial fans and marsh/deltaic environments. The groundwater beneath the site occurs within two distinct zones. An upper or shallow local unconfined water bearing zone occurs above a continuous silty-clay aquitard beneath which is the deeper aquifer. The shallow groundwater is about 30 feet below ground surface and has exhibited a thickness of less than 10 feet during drought periods. There are no reported uses of the shallow groundwater underlying the site. The shallow groundwater flows primarily toward the northwest direction with a hydraulic gradient of about 0.0097 ft/ft. The continuous silty-clay aquitard is about 70 feet below ground surface and 40 feet thick.

6.   **Remedial Investigation**: Soil and groundwater investigations, conducted in 1990, revealed the presence of PCE, its degradation products, and petroleum hydrocarbons at LASC. Subsequent investigations clearly indicated that the petroleum hydrocarbons

originated from an off-site source located southeast of LASC. Based on a "Remedial Investigation" report, dated April 1992, and previous investigations, the maximum PCE groundwater concentration was 5800 ppb and the PCE groundwater plume extended to about 950 feet along the downgradient direction. Additional investigations revealed that Paul's Cleaners at MOSC has contributed to the PCE groundwater plume. The lateral and vertical extent of PCE and its degradation products in soil and groundwater beneath the site has been delineated by a soil-gas survey, numerous soil borings, and thirty two monitoring wells including two wells screened in the deeper aquifer.

Analysis of soil samples in 1995 indicated less than 1 ppm of PCE and its degradation products in soil at the site. The groundwater PCE concentrations at Mike's and Paul's cleaners have been reduced to approximately 100 ppb. Groundwater concentrations of TCE, cis-1,2 DCE and trans-1,2 DCE, which are degradation products of PCE, are 100 to 1000 times lower than that of PCE. The PCE groundwater pollution has migrated off-site as shown in Figure 2. The downgradient monitoring wells MW-14 and MW-15, at the periphery of the PCE plume, have consistently shown approximately 10 ppb of PCE since 1990. The data generally indicate that PCE concentrations decrease with depth in the shallow groundwater. PCE groundwater concentrations less than 5 ppb have been detected intermittently in monitoring well DMW-01 (Figure 2) which is screened in the deeper aquifer. The PCE detected in this monitoring well is likely a result of cross-contamination during its installation. However, PCE levels in the monitoring well have been less than 0.5 ppb during the past three monitoring events. No PCE has been detected in DMW-02 and the California Water Service Company Wells No. 03 and 08.

7.  **Adjacent Sites:** The petroleum hydrocarbons at the site are restricted to the shallow groundwater beneath the south-eastern portion of LASC and originated from the adjacent Beacon gas station, located at 1619 First Avenue, Livermore, Alameda County . The investigation, cleanup and containment of the petroleum hydrocarbon pollution is under the regulatory oversight of the Alameda County Department of Environmental Health and is beyond the scope of this Order.

8.  **Interim Remedial Measures:** A pilot scale soil vapor extraction (SVE) system was initiated at LASC in June 1992. The PCE removal rate of the SVE system was approximately 0.42 lbs/day. The pilot scale SVE system was subsequently expanded to include air sparging. The results of the pilot study indicated that SVE with appropriate air sparging is very effective in removing PCE from the subsurface soils and reducing the PCE groundwater concentrations. The pilot system was operated intermittently until the end 1993.

9.  **Feasibility Study:** A "Feasibility Study/ Remedial Action Plan", dated July 1992, evaluated eight remedial alternatives such as no action, variations of groundwater extraction and treatment, variations of SVE/air sparging systems, and subsurface

bioremediation. The evaluation factors used were short-term and long-term effectiveness, implementability, protection of public health and the environment, costs, and community acceptability. The recommended alternative was SVE with air sparging during periods of high groundwater levels.

10. **Cleanup Plan**

    a.    <u>Original Cleanup Plan</u>:  A remedial plan was proposed in the report "Remedial Plan/Preliminary Remedial Design", dated March 1993. This plan was an extension of the pilot scale interim remedial measure and consisted of SVE with carbon treatment and, as appropriate, air sparging to remediate the soil and groundwater pollution at the entire site. The full-scale SVE/air sparging system was installed in February-March 1994. The system was initially operated as a vapor extraction unit only due to low groundwater levels. In July 1994 the system was modified to conduct both vapor extraction and air sparging. Since then the system was continually enhanced by increasing the air pressures and flow rates, and by periodically changing locations of air injection and extraction. Additionally, groundwater extraction and treatment was performed since the first quarter of 1995. The progress of the remediation is documented in quarterly reports submitted to the Board. The SVE/air sparging system ceased operation in October-December 1995 when the inlet PCE vapor concentrations to the system were 1 ppm(v) or lower and PCE groundwater concentrations reached asymptotic levels. Groundwater extraction and treatment ceased in February 1996 after demonstration that the system no longer had any measurable impact on reducing PCE concentrations in groundwater.

    b.    <u>Proposed Containment/Cleanup Plan</u>: The dischargers have proposed a non-attainment area strategy to contain and manage the residual pollution at the site. The strategy is detailed in a draft report "Request for Designation of a Containment Zone", dated February 14, 1996, and consists of a containment zone risk management plan including a contingency plan to be implemented if trigger levels are exceeded. The remedial system has been successful in reducing the PCE and its degradation products in soil to less than 1 ppm. However, the groundwater cleanup goal of 5 ppb has not been met. As described above, the SVE/air sparging system was continually enhanced and subsequently operated in conjunction with groundwater extraction and treatment until the groundwater concentrations reached asymptotic levels. Thus, the dischargers have demonstrated that achieving the 5 ppb cleanup goal is technically infeasible. The PCE groundwater concentrations have been reduced from over 1000 ppb to near 100 ppb. The proposed non-attainment area is shown in Figure 3 and applies only to the shallow groundwater.

The containment zone risk management plan contains certain pollution management measures that prohibit the use of shallow groundwater, prohibit

4

the creation of potential vertical conduits between the shallow and deeper groundwaters, and require the preparation of appropriate health and safety plans for any activities involving exposure to groundwater, within the proposed non-attainment area. Water well drilling and building construction activities in the proposed non-attainment area are permitted by the Alameda Flood Control and Water Conservation District (Zone 7) and the City of Livermore, building permit section, respectively. The dischargers plan on obtaining letters from Zone 7 and the City of Livermore that indicate that the above pollution management measures have been incorporated into the water well drilling and building construction permitting processes. The proposed building restrictions are applicable only to construction/excavation activities that occur at or below the groundwater table which is approximately 30 feet below ground surface. Exceptions to the titles of the LASC and MOSC properties will be recorded with the Alameda County Recorder's Office that indicate the existence of a containment zone risk management plan.

11.   **Risk Assessment**

a.   Original Risk Assessment: A baseline health risk assessment report, dated April 1992, evaluated the human health risks associated with PCE in soil and groundwater at the site before starting remediation. The risk assessment concluded that the cancer risks were below the excess lifetime cancer risk of 1E-06 for soil ingestion, dermal absorption, and soil gas inhalation exposure routes. However, the incremental cancer risk due to groundwater ingestion was as high as 5E-03.

b.   Non-attainment area related Risk Assessment : The dischargers conducted a post-cleanup risk assessment which is documented in the report "Health Risk Assessment", dated January 1996. The main constituents considered for the risk assessment were PCE and its degradation products TCE, cis-1,2 DCE, and trans-1,2 DCE. The current land use and the likely future use at the site are commercial. The risk assessment considered current and future exposure scenarios for the on-site commercial land use and off-site residential land use. The exposure route-pathways evaluated were inhalation of pollutants volatilizing from groundwater, inhalation and dermal absorption of pollutants from using groundwater for  bath-shower purposes, dermal absorption of pollutants from using groundwater for  irrigation purposes, and ingestion of groundwater. The risk assessment determined that PCE contributes to more than 90 % of the cancer risk and 70% of the non-cancer risk. The excess cancer risk and non-cancer risk from inhalation of pollutants volatilizing from groundwater are less than 1E-06 and 0.01 respectively, for current and future, residential and commercial scenarios. The total excess cancer and total non-cancer risk, from ingestion of groundwater and inhalation/dermal absorption of pollutants from using groundwater for bath-shower and irrigation purposes, are

5

2.6E-05 and 0.344 respectively.

For comparison, the Board considers the following risks to be acceptable at remediation sites: a hazard index of 1.0 or less for non-carcinogens, and an excess cancer risk of $10^{-4}$ or less for carcinogens.

12. **Basis for Cleanup Standards**

a. **General:** State Board Resolution No. 68-16, "Statement of Policy with Respect to Maintaining High Quality of Waters in California," applies to this discharge and requires attainment of background levels of water quality, or the highest level of water quality which is reasonable if background levels of water quality cannot be restored. Cleanup levels other than background must be consistent with the maximum benefit to the people of the State, not unreasonably affect present and anticipated beneficial uses of such water, and not result in exceedance of applicable water quality objectives.

State Board Resolution No. 92-49, "Policies and Procedures for Investigation and Cleanup and Abatement of Discharges Under Water Code Section 13304," applies to this discharge. This order and its requirements are consistent with the provisions of Resolution No. 92-49, as amended.

b. **Beneficial Uses:** The Board adopted a revised Water Quality Control Plan for the San Francisco Bay Basin (Basin Plan) on June 21, 1995. This updated and consolidated plan represents the Board's master water quality control planning document. The revised Basin Plan was approved by the State Water Resources Control Board and the Office of Administrative Law on July 20, 1995, and November 13, 1995, respectively. A summary of regulatory provisions is contained in 23 CCR 3912. The Basin Plan defines beneficial uses and water quality objectives for waters of the State, including surface waters and groundwaters.

Board Resolution No. 89-39, "Sources of Drinking Water," defines potential sources of drinking water to include all groundwater in the region, with limited exceptions for areas of high TDS, low yield, or naturally-high contaminant levels. The shallow groundwater underlying the site is of limited yield with a widely fluctuating water level. During drought periods, shallow groundwater monitoring wells yielded much less than 200 gallons per day. The deeper groundwater underlying and adjacent to the site qualifies as a potential source of drinking water.

The Basin Plan designates the following potential beneficial uses of groundwater underlying and adjacent to the site:

6

o Municipal and domestic water supply
o Industrial process water supply
o Industrial service water supply
o Agricultural water supply

At present there is no known use of the shallow groundwater underlying the site for the above purposes. However, the deeper groundwater is known to be used for municipal and domestic purposes.

The existing and potential beneficial uses of surface waters in the Livermore - Amador Valley include:

o Groundwater recharge
o Water contact and non-contact recreation
o Wildlife habitat
o Fish migration and spawning
o Warm and cold freshwater habitat

c.   **Basis for Groundwater Cleanup Standards**:  The groundwater cleanup standards for the site are based on applicable water quality objectives and are the more stringent of EPA and California primary maximum contaminant levels (MCLs). Cleanup to this level will result in acceptable residual risk to humans.

d.   **Basis for Soil Cleanup Standards**:  The soil cleanup standards for the site are 1 mg/kg total VOCs and 10 mg/kg total SVOCs.  Cleanup to this level is intended to prevent leaching of contaminants to groundwater and will result in acceptable residual risk to humans.

13.   **Basis for Non-Attainment Area**

a.   **Limits of Groundwater Remediation Technology**:  The Board has over ten years of experience overseeing the cleanup of VOC-polluted groundwater at numerous Bay Area sites.  The Board is also aware of experience elsewhere in the U.S. with such sites.  This experience demonstrates that groundwater remediation technologies are effective for pollutant removal and migration control.  However, the technologies are usually not effective in restoring beneficial uses of VOC-polluted groundwater, due to very stringent water quality objectives for many VOCs and due to prohibitively high costs and long time-frames to reach objectives.  Groundwater pollutant concentrations typically reach an asymptotic level that is significantly above the applicable water quality objective.  These findings were also part of the Board's consideration of Basin Plan groundwater amendments in late 1992. Although similar in concept to the Basin Plan amendments, this Order stands alone and does not depend upon the Basin Plan in the implementation of a non-attainment area.

7

b.   **Non-Attainment Area:**  The Board may designate a non-attainment area for areas of groundwater where water quality objectives cannot reasonably be achieved, after considering what is technologically and economically feasible within a reasonable time period.  Water quality objectives must continue to be met at the boundary outside of the designated non-attainment area.

c.   **Criteria:**  In order to designate a non-attainment area, the Board considered the following:

   i.   The dischargers have completed adequate source control (removed tanks, sumps, floating product, and other sources; removed or isolated polluted soils), and

   ii.   The dischargers have fully implemented an approved groundwater cleanup program and groundwater concentrations have reached asymptotic levels, and

   iii.   No alternative that meets groundwater objectives is technically or economically feasible, and

   iv.   The dischargers have evaluated the risks to water quality, human health, and the environment associated with the non-attainment area, and

   v.   The dischargers have proposed a risk management plan to avoid excessive risk to water quality, human health, and the environment (including reasonable mitigation for any significant adverse impacts), and

   vi.   The dischargers will conduct monitoring adequate to document that water quality objectives are met outside the non-attainment area and that risks within the non-attainment area remain acceptable.

d.   **Specific Rationale:**  Water quality objectives cannot reasonably be achieved in the area designated on Figure 3 and the area meets the above criteria for designating non-attainment areas.  Specifically,

   i.   Soil concentrations of PCE and its degradation products at the two source areas adjacent to Mike's Cleaners and Paul's Cleaners have been reduced to less than 1 ppm. Further, PCE groundwater concentrations in the source areas have been reduced from over 1000 ppb to near 100 ppb. Thus, adequate source removal has been accomplished.

   ii.   As described in Finding 10.a. above, an appropriate soil and groundwater remedial system consisting of SVE/air sparging and

groundwater extraction and treatment was implemented at the site. PCE groundwater concentrations have reached asymptotic levels. Further reduction in PCE groundwater concentrations is not technically feasible due to the high clay content and anisotropic nature of the shallow water bearing zone.

iii.    Groundwater monitoring data indicate that PCE groundwater concentrations have stabilized due to pollution source removal and remediation. Groundwater modeling, for a 30 year period, using site specific groundwater flow characteristics, attenuation, and biological transformation predicts that significant migration of the PCE plume will not occur. Further, the silty-clay aquitard separating the shallow and deeper groundwaters is considered to be continuous throughout the non-attainment area, and the potential for vertical migration of PCE through the aquitard is negligible.

iv.    As described in Finding 11.b. a human health risk assessment indicated that risks to human health due to the current and future pollutant concentrations within the non-attainment area are acceptable. As described in Finding 10.b. a containment zone risk management plan, as amended by this Order, shall be implemented to contain and manage the remaining risks within the non-attainment area.

14.    **Reuse or Disposal of Extracted Groundwater:** Board Resolution No. 88-160 allows discharges of extracted, treated groundwater from site cleanups to surface waters only if it has been demonstrated that neither reclamation nor discharge to the sanitary sewer is technically and economically feasible.

15.    **Basis for 13304 Order:** The dischargers have caused or permitted waste to be discharged or deposited where it is or probably will be discharged into waters of the State and creates or threatens to create a condition of pollution or nuisance.

16.    **Cost Recovery:** Pursuant to California Water Code Section 13304, the dischargers are hereby notified that the Board is entitled to, and may seek reimbursement for, all reasonable costs actually incurred by the Board to investigate unauthorized discharges of waste and to oversee cleanup of such waste, abatement of the effects thereof, or other remedial action, required by this order.

17.    **CEQA:** This action is an order to enforce the laws and regulations administered by the Board. As such, this action is categorically exempt from the provisions of the California Environmental Quality Act (CEQA) pursuant to Section 15321 of the Resources Agency Guidelines.

18.    **Notification:** The Board has notified the dischargers, off-site property owners within

the proposed non-attainment area, and all interested agencies and persons of its intent under California Water Code Section 13304 to prescribe site cleanup requirements for the discharge, and has provided them with an opportunity to submit their written comments. The dischargers have published a notice in the *Valley Times*, Legal Notices Section, Page 4D, dated March 27, 1996, regarding the proposed pollution management measures within the non-attainment area.

19.    **Public Hearing:**  The Board, at a public meeting, heard and considered all comments pertaining to this discharge.

**IT IS HEREBY ORDERED,** pursuant to Section 13304 of the California Water Code, that the dischargers (or their agents, successors, or assigns) shall cleanup and abate the effects described in the above findings as follows:

## A.  PROHIBITIONS

1.    The discharge of wastes or hazardous substances in a manner which will degrade water quality or adversely affect beneficial uses of waters of the State is prohibited.

2.    Further significant migration of wastes or hazardous substances through subsurface transport to waters of the State is prohibited.

3.    Activities associated with the subsurface investigation and cleanup which will cause significant adverse migration of wastes or hazardous substances are prohibited.

## B.  CLEANUP PLAN AND CLEANUP STANDARDS

1.    **Implement Containment/Cleanup Plan:**  The dischargers shall implement the containment/cleanup plan described in Finding 10.b., with the following amendments, in a manner that is acceptable to the Regional Board Executive Officer (the "Executive Officer"). The proposed containment zone risk management plan including the contingency plan is amended as follows:

    i.    Pollution management measures that prohibit the use of shallow groundwater, prohibit the creation of potential vertical conduits between the shallow and the deeper groundwaters, and require the preparation of appropriate health and safety plans for any activities involving exposure to groundwater, shall be implemented within the proposed non-attainment area.

    ii.    The trigger levels for monitoring wells MW-6, MW-13, MW-15, MW-26S, MW-26D, MW-28D, MW-31S, and MW-31D are 122 ppb, 42 ppb,

20 ppb, 873 ppb, 133 ppb, 30 ppb, 424 ppb, and 15 ppb respectively. The trigger levels are established as the mean plus two standard deviations of the PCE groundwater concentrations in the monitoring wells during the period 1990-1995.

iii.  If the total concentration of PCE and its degradation products, as analyzed by US EPA method 8010 or its equivalent, in a monitoring well exceeds the appropriate trigger level or if the trend of the total concentration of PCE and its degradation products in a monitoring well exhibits a rate of increase which indicates that the appropriate trigger level will be exceeded before the next regular sampling event, the monitoring frequency for that well shall be increased to quarterly.

iv.  If a trigger level is exceeded, the Executive Officer shall be notified within 30 days following the first observation of the exceedance.

v.  If the total concentration of PCE and its degradation products is below the appropriate trigger level for two consecutive quarters, groundwater monitoring will return to the regular schedule.

vi.  If the total concentration of PCE and its degradation products exceeds the appropriate trigger level for two consecutive quarters, groundwater extraction at appropriate locations shall commence, in a manner acceptable to the Executive Officer, within a period of 30 days following the second quarterly monitoring event.

vii.  A technical report acceptable to the Executive Officer shall be submitted documenting the completion of any actions taken under the contingency plan within a period of 45 days following the return of groundwater monitoring to the regular schedule or after implementation of groundwater extraction.

2.  **Groundwater Cleanup Standards:** Groundwater in monitoring well(s) to be installed at the boundary outside of the proposed non-attainment area, as required by task 2 of this Order, in monitoring well MW-14, and in the deep wells DMW-01, DMW-02, CWS-03 and CWS-08 shall not contain concentrations of pollutants in excess of the following limits.

| Constituent | Cleanup Standard (ug/l) | Basis |
|---|---|---|
| PCE | 5 | MCL |

11

| TCE | 5 | MCL |
|-----|---|-----|
| cis-1,2 DCE | 6 | MCL |
| trans-1,2 DCE | 10 | MCL |
| vinyl chloride | 0.5 | MCL |

3. **Contingency Plan if Cleanup Standards are exceeded:** The dischargers shall develop a contingency plan, as required by task 3 of this Order, to be implemented if the above cleanup standards are exceeded.

## C. NON-ATTAINMENT AREA

1. **Establishment of Area:** A non-attainment area is established as shown in Figure 3 and applies only to the shallow groundwater above the silty-clay aquitard, which is about 70 feet below ground surface. Groundwater cleanup standards do not apply in this area. The dischargers are required to implement the containment/cleanup plan described in Finding 10.b., as amended by this Order, in a manner that is acceptable to the Executive Officer.

2. **Conditions:** Establishment of the non-attainment area is subject to the procurement of letters from zone 7 and the City of Livermore as described in Finding 10.b. If the dischargers are unable to obtain these letters, they may propose alternate institutional constraints, acceptable to the Executive Officer, to implement the pollution management measures described in Finding 10.b.

## D. TASKS

1. **IMPLEMENTATION OF INSTITUTIONAL CONSTRAINTS**

   COMPLIANCE DATE:          (July 1, 1996)

   Submit a technical report acceptable to the Executive Officer documenting that letters from Zone 7 and the City of Livermore have been obtained which indicate that the pollution management measures, described in Finding 10.b., have been incorporated into the well drilling and building construction permitting processes OR Submit a technical report acceptable to the Executive Officer documenting procedures to be used to implement the pollution management measures described in Finding 10.b. with a time schedule for the implementation of the procedures. The technical report shall document that Exceptions to the titles of the LASC and MOSC properties, that indicate the existence of a containment zone risk management plan, have been recorded

12

with the Alameda County Recorder's Office.

2.    **MONITORING PLAN OUTSIDE THE NON-ATTAINMENT AREA**

COMPLIANCE DATE:            (August 1, 1996)

Submit a workplan acceptable to the Executive Officer to implement
groundwater monitoring at the boundary outside of the non-attainment area.
The plan should include the number, location, and depths of screening intervals
of monitoring wells to be installed and a time schedule for installation.

3.    **CONTINGENCY PLAN IF CLEANUP STANDARDS ARE EXCEEDED**

COMPLIANCE DATE:            (June 3, 1996)

Submit a technical report acceptable to the Executive Officer which describes a
contingency plan to be implemented if cleanup standards are exceeded in
monitoring well(s) to be installed as per task 2 above, in monitoring well MW-
14, and in the deep wells DMW-01, DMW-02, CWS-03 and CWS-08. The
report should include all steps to be taken with a time schedule for their
implementation.

4.    **FIVE-YEAR STATUS REPORT**

COMPLIANCE DATE:            *(May 1, 2001)*

Submit a technical report acceptable to the Executive Officer evaluating the
effectiveness of the approved containment/cleanup plan, including the
designated non-attainment area.  The report should include:

a. Summary of effectiveness in controlling contaminant migration and
   protecting human health and the environment
b. Comparison of contaminant concentration trends with cleanup standards
c. Evaluation of risk management plan associated with non-attainment area
d. Recommendations on continuation of groundwater monitoring and the
   pollution management measures.

5.    **EVALUATION OF NEW HEALTH CRITERIA**

COMPLIANCE DATE:            90 days after requested
                           by Executive Officer

13

Submit a technical report acceptable to the Executive Officer evaluating the effect on the approved containment/cleanup plan of revising one or more cleanup standards in response to adoption of revised drinking water standards, maximum contaminant levels, or other health-based criteria.

6.   **EVALUATION OF NEW TECHNICAL INFORMATION**

COMPLIANCE DATE:        90 days after requested
                        by Executive Officer

Submit a technical report acceptable to the Executive Officer evaluating new technical information which bears on the approved containment/cleanup plan and cleanup standards for this site. In the case of a new cleanup technology, the report should evaluate the technology using the same criteria used in the feasibility study. Such technical reports shall not be requested unless the Executive Officer determines that the new information is reasonably likely to warrant a revision in the approved containment/cleanup plan, cleanup standards, or risk reduction.

7.   **Delayed Compliance**: If the dischargers are delayed, interrupted, or prevented from meeting one or more of the completion dates specified for the above tasks, the dischargers shall promptly notify the Executive Officer and the Board may consider revision to this Order.

## E.  PROVISIONS

1.   **No Nuisance**: The storage, handling, treatment, or disposal of polluted soil or groundwater shall not create a nuisance as defined in California Water Code Section 13050(m).

2.   **Good O&M**: The dischargers shall maintain in good working order and operate as efficiently as possible any facility or control system installed to achieve compliance with the requirements of this Order.

3.   **Cost Recovery**: The dischargers shall be liable, pursuant to California Water Code Section 13304, to the Board for all reasonable costs actually incurred by the Board to investigate unauthorized discharges of waste and to oversee containment/cleanup of such waste, abatement of the effects thereof, or other actions, required by this Order. If the site addressed by this Order is enrolled in a State Board-managed reimbursement program, reimbursement shall be made pursuant to this Order and according to the procedures established in that program. Any disputes raised by the dischargers over reimbursement amounts or methods used in that program shall be consistent with the dispute resolution

procedures for that program.

4.    **Access to Site and Records**:  In accordance with California Water Code Section 13267(c), the dischargers shall permit the Board or its authorized representative:

  a.    Entry upon premises in which any pollution source exists, or may potentially exist, or in which any required records are kept, which are relevant to this Order.

  b.    Access to copy any records required to be kept under the requirements of this Order.

  c.    Inspection of any monitoring or remediation facilities installed in response to this Order.

  d.    Sampling of any groundwater or soil which is accessible, or may become accessible, as part of any investigation or remedial action program undertaken by the dischargers.

5.    **Self-Monitoring Program**:  The dischargers shall comply with the Self-Monitoring Program as attached to this Order and as may be amended by the Executive Officer.

6.    **Contractor / Consultant Qualifications**:  All technical documents shall be signed by and stamped with the seal of a California registered geologist, a California certified engineering geologist, or a California registered civil engineer.

7.    **Lab Qualifications**:  All samples shall be analyzed by State-certified laboratories or laboratories accepted by the Board using approved EPA methods for the type of analysis to be performed.  All laboratories shall maintain quality assurance/quality control (QA/QC) records for Board review. This provision does not apply to analyses that can only reasonably be performed on-site (e.g. temperature).

8.    **Document Distribution**:  Copies of all correspondence, technical reports, and other documents pertaining to compliance with this Order shall be provided to the following agencies:

  a.  City of Livermore, Building Permits Section
  b.  County of Alameda, Zone 7

The Executive Officer may modify this distribution list as needed.

15

9.    **Reporting of Changed Owner or Operator:** The dischargers shall file a technical report on any changes in site occupancy or ownership associated with the LASC and MOSC properties.

10.    **Reporting of Hazardous Substance Release:** If any hazardous substance is discharged in or on any waters of the State, or discharged or deposited where it is, or probably will be, discharged in or on any waters of the State, the dischargers shall report such discharge to the Regional Board by calling (510) 286-1255 during regular office hours (Monday through Friday, 8:00 to 5:00).

A written report shall be filed with the Board within five working days. The report shall describe: the nature of the hazardous substance, estimated quantity involved, duration of incident, cause of release, estimated size of affected area, nature of effect, corrective actions taken or planned, schedule of corrective actions planned, and persons/agencies notified.

This reporting is in addition to reporting to the Office of Emergency Services required pursuant to the Health and Safety Code.

11.    **Rescission of Existing Order:** This Order supercedes and rescinds Order No. 93-139. In the event that this Order is not adopted by the Board, Order No. 93-139 shall continue to be effective.

12.    **Periodic SCR Review:** The Board will review this Order periodically and may revise it when necessary.

I, Loretta K. Barsamian, Executive Officer, do hereby certify that the foregoing is a full, true, and correct copy of an Order adopted by the California Regional Water Quality Control Board, San Francisco Bay Region, on April 17, 1996.

*Loretta K. Barsamian*
Loretta K. Barsamian
Executive Officer

FAILURE TO COMPLY WITH THE REQUIREMENTS OF THIS ORDER MAY SUBJECT YOU TO ENFORCEMENT ACTION, INCLUDING BUT NOT LIMITED TO: IMPOSITION OF ADMINISTRATIVE CIVIL LIABILITY UNDER WATER CODE SECTIONS 13268 OR 13350, OR REFERRAL TO THE ATTORNEY GENERAL FOR INJUNCTIVE RELIEF OR CIVIL OR CRIMINAL LIABILITY

Attachments:  Figures
              Self-Monitoring Program

**Figure 1 Site Map**



Area of Site Investigation

Scale: 0     24,000 feet     48,000 feet

N

Source: USGS Livermore Quadrangle, Alameda County, 1961. Photorevised 1980.



FIGURE 2
TETRACHLOROETHENE
CONTOUR MAP
AUGUST 1995

SCALE: 1" = 280'



FIGURE 3
PROPOSED
NON-ATTAINMENT AREA

**CALIFORNIA REGIONAL WATER QUALITY CONTROL BOARD**
**SAN FRANCISCO BAY REGION**

SELF-MONITORING PROGRAM FOR:

GRUBB AND ELLIS REALTY INCOME TRUST, LIQUIDATING TRUST; STARK
INVESTMENT COMPANY; CATELLUS DEVELOPMENT CORPORATION; STEVEN
SONG, MICHAEL NEELY AND PERRY NEELY dba MIKE' S ONE HOUR CLEANERS;
MILLER' S OUTPOST SHOPPING CENTER ASSOCIATES, IMA FINANCIAL
CORPORATION; KATHLEEN McCORDUCK, JOHN McCORDUCK, PAMELA
McCORDUCK AND SANDRA McCORDUCK MARONA; FORTNEY H. STARK, JR.;
CHARLES HARTZ dba PAUL' S SPARKLE CLEANERS

for the properties

LIVERMORE ARCADE SHOPPING CENTER
located at  FIRST AVENUE AND "P" STREET, AND
MILLER' S OUTPOST SHOPPING CENTER
located at RAILROAD AVENUE AND "P" STREET
LIVERMORE, ALAMEDA COUNTY

1. **Authority and Purpose**:  The Board requests the technical reports required in this Self-
Monitoring Program pursuant to Water Code Sections 13267 and 13304.  This Self-
Monitoring Program is intended to document compliance with Board Order No. 96- 052 (site
cleanup requirements).

2. **Monitoring**:  The dischargers shall measure groundwater elevations semi-annually in all
monitoring wells, and shall collect and analyze representative samples of groundwater
according to the following table:

| Well # | Sampling Frequency | Analyses | Well # | Sampling Frequency | Analyses |
|--------|--------------------|----------|--------|--------------------|----------|
| MW-6   | SA | 8010 | MW-31S  | SA | 8010 |
| MW-13  | SA | 8010 | MW-31D  | SA | 8010 |
| MW-14  | SA | 8010 | DMW-01  | SA | 8010 |
| MW-15  | SA | 8010 | CWS-03* | SA | 8010 |
| MW-26S | SA | 8010 | CWS-08* | SA | 8010 |

17

| MW-26D | SA | 8010 | | | |
|--------|----|----|---|---|---|
| MW-28D | SA | 8010 | | | |

\*Whenever wells are in operation, but no more than one sample per 6 months

Key:    SA = Semi-Annually  8010 = EPA Method 8010 or equivalent

The dischargers shall sample any new monitoring wells semi-annually and analyze groundwater samples for the same constituents as shown in the above table.  The dischargers may propose changes in the above table; any proposed changes are subject to Executive Officer approval.

3.    **Semi-annual Monitoring Reports**: The dischargers shall submit semi-annual monitoring reports to the Board no later than 30 days following the end of the monitoring period (e.g. report for first semi-annual monitoring period of the year would be due July 30).  The first semi-annual monitoring report shall be due on July 30, 1996. The reports shall include:

a.    Transmittal Letter:  The transmittal letter shall discuss any violations during the reporting period and actions taken or planned to correct the problem.  The letter shall be signed by the dischargers' principal executive officer or his/her duly authorized representative, and shall include a statement by the official, under penalty of perjury, that the report is true and correct to the best of the official's knowledge.

b.    Groundwater Elevations:  Groundwater elevation data shall be presented in tabular form, and a groundwater elevation map should be prepared for each monitored water-bearing zone.  Historical groundwater elevations shall be included in the second semi-annual report each year.

c.    Groundwater Analyses:  Groundwater sampling data shall be presented in tabular form, and an isoconcentration map should be prepared for one or more key contaminants for each monitored water-bearing zone, as appropriate.  The report shall indicate the analytical method used, detection limits obtained for each reported constituent, and a summary of QA/QC data.  Historical groundwater sampling results shall be included in the second semi-annual report each year.  The report shall describe any significant increases in contaminant concentrations since the last report, and any measures proposed to address the increases.  Supporting data, such as lab data sheets, need not be included (however, see record keeping - below).

d.    Groundwater Extraction:  If applicable, the report shall include groundwater extraction results in tabular form, for each extraction well and for the site as a

18

whole, expressed in gallons per minute and total groundwater volume for the quarter. The report shall also include contaminant removal results, from groundwater extraction wells and from other remediation systems (e.g. soil vapor extraction), expressed in units of chemical mass per day and mass for the quarter. Historical mass removal results shall be included in the second semi-annual report each year.

e.    Status Report: The semi-annual report shall describe relevant work completed during the reporting period (e.g. site investigation, interim remedial measures) and work planned for the following quarter.

5.    **Violation Reports**: If the dischargers violate requirements in the Site Cleanup Requirements, then the dischargers shall notify the Board office by telephone as soon as practicable once the dischargers have knowledge of the violation. Board staff may, depending on violation severity, require the dischargers to submit a separate technical report on the violation within five working days of telephone notification.

6.    **Other Reports**: The dischargers shall notify the Board in writing prior to any site activities, such as construction or underground tank removal, which have the potential to cause further migration of contaminants or which would provide new opportunities for site investigation.

7.    **Record Keeping**: The dischargers or their agent shall retain data generated for the above reports, including lab results and QA/QC data, for a minimum of six years after origination and shall make them available to the Board upon request.

8.    **SMP Revisions**: Revisions to the Self-Monitoring Program may be ordered by the Executive Officer, either on his/her own initiative or at the request of the dischargers. Prior to making SMP revisions, the Executive Officer will consider the burden, including costs, of associated self-monitoring reports relative to the benefits to be obtained from these reports.

I, Loretta K. Barsamian, Executive Officer, hereby certify that this Self-Monitoring Program was adopted by the Board on April 17, 1996.

*Loreth K. Barsamue*
Loretta K. Barsamian
Executive Officer

19

EXHIBIT 3

## AGREEMENT TO WAIVE ARBITRATION PROVISION

This Agreement To Waive Arbitration Provision (hereafter the "Agreement") is dated and entered into as of the _____th day of June, 2008, by and between Grubb & Ellis Realty Income Trust, Liquidating Trust; Michael R. Neely, Perry J. Neely, and Gary Neely, as individuals and dba Mike's One Hour Cleaners; Multimatic Corporation, a New Jersey corporation; Western State Design, a California corporation; McCorduck Properties Livermore, LLC, a Delaware limited liability company, as the successor to IMA Financial Corporation, a California corporation, Kathleen McCorduck, John McCorduck, Pamela McCorduck, and Sandra McCorduck Marona; Palmtree Acquisition Corporation, a Delaware corporation, f/k/a Catellus Development Corporation; Stark Investment Company, a California general partnership and Fortney Stark, an individual (hereafter referred to collectively as "the Parties").

## RECITALS

A.     Effective on or about February 7, 1994, the Parties entered into a written Settlement Agreement and General Release (hereafter the "Settlement Agreement") regarding settlement of a lawsuit then pending in the United States District Court for the Northern District of California titled <u>Grubb & Ellis Realty Income Trust v. Catellus Development Corporation, et al.</u>, which, with its related cross-actions, was designated Case No. C 93-0383 SBA (the "Action"). The Action concerned liability for alleged contamination at and beneath real property known as the Livermore Arcade Shopping Center, and a nearby commercial property known as Miller's Outpost Shopping Center, both in Livermore, California (collectively, the "Site").

B.     Pursuant to Paragraph 9 of the Settlement Agreement, the Parties released each other from claims relating to the Site that were or could have been raised in the Action, with limited exceptions, including claims brought by third parties following the date of the Settlement Agreement relating to PCE contamination at the Site, and actions by governmental agencies requiring cleanup of PCE contamination or seeking recovery of governmental response costs for the cleanup of PCE contamination: (a) of the deeper aquifer as defined in paragraph 5 of the Site Cleanup Order or (b) in the form of DNAPLs (the "Reopener").

C.     Paragraph 22 of the Settlement Agreement provides that under specified circumstances, disputes among the Parties relating to the Settlement Agreement shall be resolved by binding arbitration administered by Judicial Arbitration and Mediation Services, Inc. (the "Arbitration Provision").

D.     The Parties have now received demands from the Zone 7 Water Agency and an administrative order from the Regional Water Quality Control Board, San Francisco Bay Region ("Board") regarding, among other things, alleged PCE contamination in the deeper aquifer, as referenced in Paragraph 9 of the Settlement Agreement and triggering the Reopener (collectively, "New Claims").

E.     The Parties dispute various matters relating to their alleged and respective obligations in connection with the New Claims, and further dispute the extent to which the Arbitration Provision applies to such New Claims. The Parties agree, however, that resolution of

liability issues relating to the New Claims will likely involve litigation in Federal District Court by the Parties against (and likely among) third parties who are not Parties to the Settlement Agreement and therefore not subject to the Arbitration Provision. To avoid litigation in multiple forums, to permit a timely response to the New Claims and to cost-effectively resolve liability matters relating to the New Claims, the Parties desire to waive the Arbitration Provision consistent with the terms of this Agreement.

WHEREFORE, in consideration of the respective covenants hereafter set forth, the Parties hereby agree as follows:

### AGREEMENTS

1.     The Arbitration Provision is hereby waived to the extent required to permit the resolution of all disputes relating to the New Claims. This waiver is without prejudice to, and shall not constitute a waiver of, the right of any Party to seek reformation of the Settlement Agreement to eliminate the Arbitration Provision. The Parties anticipate that one or more Parties will shortly file an action in Federal District Court in connection with the New Claims (the "New Action").

2.     The Parties agree to work in good faith to resolve liability issues relating to the New Claims in a manner that limits transaction costs. Concurrently with the filing of the New Action, the Parties shall execute and cause to be filed a stipulation: (a) providing that all of the answers and cross-complaints previously filed by each of the Parties in the Action shall, to the extent permitted by the Court, be deemed to have been filed and served in the New Action, and (b) requesting that the Court immediately refer the case to mediation and order that mediation commence within thirty (30) days of said referral.

3.     This Agreement may be executed in counterparts. Each signatory below represents and warrants that he or she has authority to execute this Agreement on behalf of the Party indicated.

4.     The signature of any Party to this Agreement which is transmitted via facsimile ("fax") or electronically via PDF document shall be deemed for all purposes to be the equivalent of an original signature of said Party.

### [SIGNATURES ARE SET FORTH ON THE NEXT PAGE]

IN WITNESS WHEREOF, the parties have executed this Agreement effective as of the date first written above.

DATED: _____     Grubb & Ellis Realty Income Trust

                                    By: _____
                                        Harold A. Ellis, Jr.
                                        Its: Trustee


DATED: _____     _____
                                    Michael R. Neely, dba Mike's One Hour Cleaners


DATED: _____     _____
                                    Perry J. Neely, dba Mike's One Hour Cleaners


DATED: _____     _____
                                    Gary Neely, dba Mike's One Hour Cleaners


DATED: _____     Multimatic Corporation

                                    By: _____

                                    Its: _____


DATED: _____     Western State Design

                                    By: _____

                                    Its: _____


DATED: _____     McCorduck Properties Livermore, LLC as
                                    successor to IMA Financial Corporation, Kathleen
                                    McCorduck, John McCorduck, Pamela McCorduck,
                                    and Sandra McCorduck

                                    By: _____
                                        John McCorduck
                                        Its: Managing Member

AGREEMENT TO WAIVE
ARBITRATION PROVISION            3 of 4

IN WITNESS WHEREOF, the parties have executed this Agreement effective as of the date first written above.

DATED: _____    Grubb & Ellis Realty Income Trust

By: _____

Its: _____

DATED: _06\05\08_    *Michael R. Neely*

Michael R. Neely, dba Mike's One Hour Cleaners

DATED: _____    _____
Perry J. Neely, dba Mike's One Hour Cleaners

DATED: _____    _____
Gary Neely, dba Mike's One Hour Cleaners

DATED: _____    Multimatic Corporation

By: _____

Its: _____

DATED: _____    Western State Design

By: _____

Its: _____

DATED: _____    McCorduck Properties Livermore, LLC as successor to IMA Financial Corporation, Kathleen McCorduck, John McCorduck, Pamela McCorduck, and Sandra McCorduck

By: _____
      John McCorduck
      Its: Managing Member

AGREEMENT TO WAIVE
ARBITRATION PROVISION            3 of 4

IN WITNESS WHEREOF, the parties have executed this Agreement effective as of the date first written above.

DATED: _____        Grubb & Ellis Realty Income Trust

                                       By: _____

                                       Its: _____


DATED: _____        _____
                                       Michael R. Neely, dba Mike's One Hour Cleaners


DATED: ___6 - 2 -08____                _____
                                       Perry J. Neely, dba Mike's One Hour Cleaners


DATED: ___6-2-08____                   _____
                                       Gary Neely, dba Mike's One Hour Cleaners


DATED: _____        Multimatic Corporation

                                       By: _____

                                       Its: _____


DATED: _____        Western State Design

                                       By: _____

                                       Its: _____


DATED: _____        McCorduck Properties Livermore, LLC as
                                       successor to IMA Financial Corporation, Kathleen
                                       McCorduck, John McCorduck, Pamela McCorduck,
                                       and Sandra McCorduck

                                       By: _____
                                           John McCorduck
                                           Its: Managing Member


AGREEMENT TO WAIVE
ARBITRATION PROVISION                  3 of 4

IN WITNESS WHEREOF, the parties have executed this Agreement effective as of the date first written above.

DATED: _____          Grubb & Ellis Realty Income Trust

                                 By: _____

                                 Its: _____


DATED: _____          _____
                                 Michael R. Neely, dba Mike's One Hour Cleaners


DATED: _____          _____
                                 Perry J. Neely, dba Mike's One Hour Cleaners


DATED: _____          _____
                                 Gary Neely, dba Mike's One Hour Cleaners


DATED: _____          Multimatic Corporation

                                 By: _Gertrud Hahn_____

                                 Its: _President_____


DATED: _____          Western State Design

                                 By: _____

                                 Its: _____


DATED: _____          McCorduck Properties Livermore, LLC as
                                 successor to IMA Financial Corporation, Kathleen
                                 McCorduck, John McCorduck, Pamela McCorduck,
                                 and Sandra McCorduck

                                 By: _____
                                      John McCorduck
                                      Its: Managing Member

IN WITNESS WHEREOF, the parties have executed this Agreement effective as of the date first written above.

DATED: _____     Grubb & Ellis Realty Income Trust

By: _____

Its: _____


DATED: _____     _____
Michael R. Neely, dba Mike's One Hour Cleaners


DATED: _____     _____
Perry J. Neely, dba Mike's One Hour Cleaners


DATED: _____     _____
Gary Neely, dba Mike's One Hour Cleaners


DATED: _____     Multimatic Corporation

By: _____

Its: _____


DATED: _6_/_03_/_2008_          Western State Design

By: _____

Its: _PRESIDENT_____


DATED: _____     McCorduck Properties Livermore, LLC as
                               successor to IMA Financial Corporation, Kathleen
                               McCorduck, John McCorduck, Pamela McCorduck,
                               and Sandra McCorduck

By: _____
    John McCorduck
    Its: Managing Member


AGREEMENT TO WAIVE
ARBITRATION PROVISION          3 of 4

IN WITNESS WHEREOF, the parties have executed this Agreement effective as of the date first written above.

DATED: _____        Grubb & Ellis Realty Income Trust

                                       By: _____

                                       Its: _____


DATED: _____        _____
                                       Michael R. Neely, dba Mike's One Hour Cleaners


DATED: _____        _____
                                       Perry J. Neely, dba Mike's One Hour Cleaners


DATED: _____        _____
                                       Gary Neely, dba Mike's One Hour Cleaners


DATED: _____        Multimatic Corporation

                                       By: _____

                                       Its: _____


DATED: _____        Western State Design

                                       By: _____

                                       Its: _____


DATED: 6/05/2008                       McCorduck Properties Livermore, LLC as
                                       successor to IMA Financial Corporation, Kathleen
                                       McCorduck, John McCorduck, Pamela McCorduck,
                                       and Sandra McCorduck

                                       By: _____McCorduck_____
                                       John McCorduck
                                       Its: Managing Member

DATED: _27 June, 2008_    Palmtree Acquisition Corporation f/k/a Catellus
Development Corporation

By: _____

Its: _Managing Director_


DATED: _____    Stark Investment Company

By: _____

Its: _____


DATED: _____    _____
Fortney Stark

57671\122229v2

AGREEMENT TO WAIVE
ARBITRATION PROVISION          4 of 4

DATED: _____

Palmtree Acquisition Corporation f/k/a Catellus
Development Corporation

By: _____

Its: _____


DATED: _5/30/08_____

Stark Investment Company
By: Stark Investment Corporation
Its: General Partner

_____
Fortney Stark, President


DATED: _5/30/08_____

_____
Fortney Stark

57671\122229v2

JS 44 (Rev. 12/07) (cand rev 1-16-08)

## CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.    (SEE INSTRUCTIONS ON PAGE TWO OF THE FORM.)

**I. (a) PLAINTIFFS**

PALMTREE ACQUISITION CORPORATION, a Delaware corporation f/k/a Catellus Development Corporation

**DEFENDANTS**

(SEE ATTACHMNET A)

**(b)** County of Residence of First Listed Plaintiff  Denver, Colorado
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant    Alameda, California
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Stuart I. Block (SBN 160688); Peter M. Morrisette (SBN 209190)
COX, CASTLE & NICHOLSON LLP
555 California Street, Floor 10; San Francisco, CA 94104-1513
Phone: (415) 392-4200

Attorneys (If Known)

(SEE ATTACHMENT B)

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

| | |
|---|---|
| ☐ 1  U.S. Government Plaintiff | ☒ 3  Federal Question (U.S. Government Not a Party) |
| ☐ 2  U.S. Government Defendant | ☐ 4  Diversity (Indicate Citizenship of Parties in Item III) |

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                    and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury — | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | | ☐ 892 Economic Stabilization Act |
| | | | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 791 Empl. Ret. Inc. | | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | Security Act | ☐ 870 Taxes (U.S. Plaintiff | ☐ 895 Freedom of Information |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | | or Defendant) | Act |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party | ☐ 900Appeal of Fee |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | 26 USC 7609 | Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities – | ☐ 540 Mandamus & Other | **IMMIGRATION** | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | ☐ 462 Naturalization Application | | to Justice |
| | ☐ 446 Amer. w/Disabilities – | ☐ 555 Prison Condition | ☐ 463 Habeas Corpus – | | ☐ 950 Constitutionality of |
| | Other | | Alien Detainee | | State Statutes |
| | ☐ 440 Other Civil Rights | | ☐ 465 Other Immigration | | |
| | | | Actions | | |

**V. ORIGIN** (Place an "X" in One Box Only)

| | | | | | |
|---|---|---|---|---|---|
| ☒ 1  Original Proceeding | ☐ 2  Removed from State Court | ☐ 3  Remanded from Appellate Court | ☐ 4  Reinstated or Reopened | ☐ 5  Transferred from another district (specify) | ☐ 6  Multidistrict Litigation | ☐ 7  Appeal to District Judge from Magistrate Judgment |

**VI. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
42 U.S.C. section 9607(a)
Brief description of cause:
Recovery of cleanup costs under CERCLA

**VII. REQUESTED IN COMPLAINT:**    ☐ CHECK IF THIS IS A CLASS ACTION    DEMAND $    CHECK YES only if demanded in complaint:
UNDER F.R.C.P. 23    JURY DEMAND:  ☒ Yes ☐ No

**VIII. RELATED CASE(S) IF ANY**    PLEASE REFER TO CIVIL L.R. 3-12 CONCERNING REQUIREMENT TO FILE
"NOTICE OF RELATED CASE".

**IX. DIVISIONAL ASSIGNMENT (CIVIL L.R. 3-2)**
(PLACE AND "X" IN ONE BOX ONLY)    ☒ SAN FRANCISCO/OAKLAND    ☐ SAN JOSE

DATE    July 1, 2008    SIGNATURE OF ATTORNEY OF RECORD

## ATTACHMENT A

1.   Michael R. Neely, an individual and dba Mike's One Hour Cleaners

2.   Perry J. Neely, an individual and dba Mike's One Hour Cleaners

3.   Gary Neely, an individual and dba Mike's One Hour Cleaners

4.   Charles Frederick Hartz an individual and dba Paul's Sparkle Cleaners

5.   Multimatic Corporation, a New Jersey corporation

6.   Western States Design, a California Corporation

7.   McCorduck Properties Livermore, LLC, a Delaware limited liability company as successor to John McCorduck, Kathleen McCorduck, Pamela McCorduck, and Sandra McCorduck Marona and IMA Financial Corporation, a California corporation

8.   Stark Investment Company, a California general partnership

9.   Grubb & Ellis Realty Income Trust Liquidating Trust, a California trust.

**ATTACHMENT B**

1.  Christine K. Noma, Esq.
    Wendel, Rosen, Black & Dean, LLP
    1111 Broadway, 24th Floor
    Oakland, CA 94607
    P.O. Box 2047
    Oakland, CA 94604-2047
    Attorneys for Michael R. Neely individually and dba Mike's One Hour Cleaners;
    Perry J. Neely Mike's individually and dba Mike's One Hour Cleaners; and Gary Neely
    individually and dba Mike's One Hour Cleaners.

2.  Robert C. Goodman, Esq.
    Zachary M. Radford, Esq
    Rogers Joseph O'Donnell
    311 California Street, 10th Floor
    San Francisco, CA 94104
    Attorneys for Charles Frederick Hartz and dba Paul's Sparkle Cleaners

3.  Thomas A. Vandenberg, Esq.
    Dongell Lawrence Finney, LLP
    707 Wilshire Boulevard, 45th Floor
    Los Angeles, CA 90017
    Attorneys for Multimatic Corporation

4.  Kenneth W. Pritikin, Esq.
    Foley McIntosh Frey & Claytor
    3675 Mt. Diablo Blvd., Suite 250
    Lafayette, CA 94549
    Attorneys for Western States Design

5.  Bruce C. Paltenghi, Esq.
    Gordon, Watrons, Ryan, Langley, Bruno & Paltenghi
    611 Las Juntas Street
    Martinez, CA 94533-1221
    Attorneys for McCorduck Properties Livermore, LLC

6.  Paul Kozachenko, Esq.
    Gonsalves & Kozachenko
    1133 Auburn Street
    Fremont, CA 94538
    Attorneys for Stark Investment Company

7.  James F. Ellis
    Ellis Partners LLC
    111 Sutter Street, Suite 800
    San Francisco, CA 94104
    Representative for Grub & Ellis Realty Income Trust Liquidating Trust